IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00635-CMA-KLM

JOEL RAGUINDIN, and
JENNA FOX,

      Plaintiffs,

v.

MICHAEL YATES, individually,
JASON PHIPPS, individually,
MIKE PARKOS, individually,
PATRICK HAUGSE, individually,
CHIEF OF POLICE RICK BRANDT, in his official capacity,
WELD COUNTY SHERIFF STEVEN REAMS, individually and in his official capacity, and
PAUL WOOD, individually,

      Defendants.

_____

## ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on the **Motion to Dismiss by the City of Evans Defendants[1]** [#32][2] (the "Evans Motion") and the **Motion to Dismiss Asserting Qualified Immunity** [#44] (the "Weld Motion" and collectively with the Evans Motion, the "Motions"))[3] filed by Defendants Steven Reams and Paul Wood (collectively the "Weld Defendants").

_____

    [1] Throughout this Recommendation the Court refers to Defendants Michael Yates, Jason Phipps, Mike Parkos, Patrick Haugse, and Chief of Police Rick Brandt as the "Evans Defendants."

    [2] "[#38]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's electronic case filing and management system (CM/ECF). This convention is used throughout the Recommendation.

    [3] As noted in the Conclusion, the Court also rules on the motions [##45, 51] requesting a stay of this action pending resolution of the Motions.

Plaintiffs filed a response in opposition to the Evans Motion [#43] (the "Evans Response") and a response in opposition to the Weld Motion [#55] (the "Weld Response" and collectively with the Evans Response, the "Responses").  The Evans Defendants filed a reply in further support of their motion [#46] (the "Evans Reply") and the Weld Defendants filed a reply in further support of their motion [#64] (the "Weld Reply" and collectively with the Evans Reply, the "Replies").  The Motions are thus ripe for review.  Pursuant to 28 U.S.C. § 636(b)(1) and D.C.COLO.LCivR 72.1(c)(3), the Motions are referred to the undersigned for recommendation regarding disposition [##33, 47].  Having reviewed the entire case file and being sufficiently advised, the Court **RECOMMENDS** that the Motions [##32, 44] be **GRANTED in part** and **DENIED in part** as discussed below**.**

## I.  Summary of the Case

### A.    Allegations

Plaintiffs assert constitutional and tort claims against Defendants relating to the alleged murder of Ashley Fallis by her husband, Tom Fallis.  *See generally Second Am. Compl.* [#22].  Specifically, Plaintiffs allege that Defendants, employees of the Evans Police Department and the Weld County Sheriff's Department, covered-up the alleged murder of Ms. Fallis, their daughter, which led the Weld County Coroner's office to deem the death a suicide.  *Id.* ¶¶ 4-5, 23.  Plaintiffs seek compensatory damages, consequential damages, special damages, actual damages, punitive damages, interest, and attorneys' fees and costs.  *Id.* at 38.

Defendants Yates, Phipps, Parkos, Haugse, and Wood are each sued in their individual capacities.  *Id.* ¶¶ 24-27, 30.  Defendant Brandt is sued in his official capacity as

2

the Chief of Police of the Evans Police Department.  *Id.* ¶ 28.  Defendant Reams is sued

both individually and in his official capacity as Sheriff of Weld County.  *Id.* ¶ 29.

Plaintiffs explain that because they "lack access to documents which are in the

exclusive control of Defendants" and their respective employers,"individual Defendants'

exact actions cannot yet be more precisely identified by Plaintiffs prior to discovery . . . ."

*Id.* ¶ 31.  As a result, Plaintiffs offer the following facts[4] as they understand them and make

allegations as to all Defendants.  *Id.*

On January 1, 2012, Ashley Fallis died from a gunshot wound to the head.  *Id.* ¶ 2.

On January 6, 2012, her death was pronounced a suicide by the Weld County Coroner's

office.  *Id.* ¶ 5.  At all relevant times, "there was substantial evidence that Ashley Fallis was

shot and killed by her husband, Tom Fallis."  *Id.* ¶ 3.  On March 1, 2012, Chief Brandt

"formally closed the investigation and officially ratified the designation that Ms. Fallis' death

was a suicide."  *Id.* ¶ 135.  Plaintiffs "repeatedly asked the Evans Police Department to not

close the investigation, stating that they believed their suicide conclusion was premature."

*Id.* ¶ 136.

After Ashley Fallis was shot,

[t]op-level officials including Sheriff Steven Reams, former Sheriff John
Cooke and Commander/Sergeant Paul Wood and Jeff Rodriguez along with
Deputies Chris Graves, Brian Spencer and Andrea Rusch, and/or other John
Doe or Jane Doe persons from the Weld County Sheriff's Department

---

[4] For the purposes of considering the Motions, the Court takes the following facts from the
Second Amended Complaint [#22].  The factual allegations in Plaintiffs' Second Amended
Complaint are presumed true unless they are conclusory or contradicted by other, more specific
allegations.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) ("conclusory and
formulaic recitations" of the elements "are insufficient to survive a motion to dismiss"); *DPWN
Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 152 (2d Cir. 2014) (holding that
"general allegations that are contradicted by more specific allegations in the Complaint" need not
be accepted as true (quotation omitted)).

> became immediately involved with the Evans investigation following Ashley Fallis' death, visited the crime scene, participated in the early review of the same, and/or were jointly involved with obstruction including the suppression or destruction of evidence, including original evidence of the confession of Tom Fallis and/or with multiple instructions or case related actions on and after the day of the shooting.

*Id.* ¶ 69. Plaintiffs discuss the investigation conducted by a news reporter, Justin Joseph, regarding Ms. Fallis' death and maintain that

> until the aforementioned reporting in April 2014, and with respect to the Weld County related Defendants until April 2015, Plaintiffs had no way of knowing that the suicide designation was the result of a corrupt investigation that was intentionally incomplete and based on what was internally known to the involved Defendants to be a highly inaccurate version of the key facts about the incident, which these individual Defendants and others fraudulently concealed from Plaintiffs and the public, making the doctrines of equitable tolling and fraudulent concealment applicable to the accrual and filing of these claims.

*Id.* ¶ 137.

Plaintiffs offer specific allegations as to each Defendant, which the Court discusses as part of its analysis of Plaintiffs' claims. As the Evans Defendants succinctly put it: "[t]he parties do not materially disagree on the allegations, to wit, Plaintiffs generally allege that the Evans officers covered up the fact that Plaintiffs' daughter did not commit suicide but, rather, that her husband allegedly murdered her." *Evans Reply* [#46] at 1. However, some examples of Plaintiffs' allegations are included below to help explain the level of involvement Plaintiffs allege on the part of Defendants with regard to the alleged cover-up of what they maintain was the murder of Ms. Fallis by her husband.[5]

---

[5] As noted in the Second Amended Complaint, following the investigatory report conducted by Justin Joseph, the Evans Police Department re-opened the investigation into Ashley Fallis' death and the Fort Collins Police Department conducted an independent investigation. *Id.* ¶ 157. Tom Fallis was indicted for the murder of Ashley Fallis in November 2014. *Id.* ¶ 159. That criminal lawsuit is on-going.

Defendant Paul Wood, acting, on information and belief, at the instruction of Sheriff Reams who was supervising, gave multiple orders at the scene to Weld County deputies, including justice obstructing orders not to write reports regarding what they saw, heard or learned and when to leave the residence.

. . .

A neighbor and witness, Nick Glover, was interviewed by Officer Yates and told him that he overheard Tom Fallis confess to his parents that he murdered his wife, as reported by Fox31 News in April 2014.

Nick Glover reportedly told Defendant Yates that he distinctly heard him say, "I shot her."

More specifically, during his interview with Officer Yates, shared, on information and belief, with the other individual defendants, Mr. Glover reported that he heard the following incriminating exchange immediately after the shooting between Mr. Fallis and his parents that Officer Yates is believed to have written down:
- Mr. Fallis: "Oh my God, I can't believe I did it. Oh my God, what have I done. What have I done."
- Mr. Fallis' parents: "What. What are you saying."
- Mr. Fallis: "I shot her."

Outrageously, Officer Yates and/or other involved Defendants or Evans police officers consciously decided to not include this highly incriminating confession witnessed by Mr. Glover or that a confession by Tom Fallis was also heard by other officers in their official reports.

Officer Yates, on information and belief, supported and/or supervised by the other individual defendants, additionally altered/destroyed another witness's original reporting of the shooting, changing her report from a highly incriminating account into a manufactured suicide account.

Thus, Mr. Glover's mother, Kathy Glover, reported to Officer Yates that she received a phone call from neighbor Chelsea Arrigo immediately after the shooting.

She reported that Ms. Arrigo told her: **"Call police, your neighbor just shot his wife."** (Emphasis supplied).

Officer Yates, on information and belief, with the knowledge or support of the other individual defendants, however, deliberately altered and/ or destroyed this phone conversation in his official report, falsely characterizing Ms. Arrigo's original statement to Ms. Glover as: **"[P]lease tell me you called the cops . . . your neighbor just shot herself."** (Emphasis Supplied).

Upon learning that their accounts had been altered, Nick Glover and Kathy Glover reportedly prepared sworn affidavits describing their original accounts to the police, and have also stated that they were shocked to learn of the omissions and misstatements in the police reports that were prepared.

When confronted about his conduct as described by these witnesses, Defendant Yates reportedly did not deny the claims and referred the reporter to Chief Brandt.

. . .

Weld County Deputy Sheriff, Chris Graves, was "instructed" by Evans police to watch Tom Fallis at the scene.

While doing so, Deputy Graves heard Tom Fallis confess to killing his wife.

Several law enforcement officers were also then present in a position to hear Tom Fallis so state and confess.

On information and belief, the Evans Police Department related Defendants or some of them and/or other Evans police officers also heard and/or were otherwise aware of this confession by Tom Fallis but, as afore alleged, did not include it in any of their reports or arrest and charge Tom Fallis.

Defendant Commander Wood, acting, on information and belief, at the instruction of Defendant Sheriff Reams, told multiple deputies responding to the scene, including Chris Graves and Andrea Rusch directly and/or in response to inquiries, that they were not to write reports concerning this matter.

Recently to further divert from his own liability, Defendant Reams has falsely stated that the explanation for no reports was not these outrageous command instructions but rather resides "in the power of laziness" by the former deputy.

On information and belief, Defendant Wood and Defendant Reams, in taking these and related actions together with the Evans police Defendants, were consciously aware that Deputy Graves and/or other Weld County and Evans officers had also overhead Tom Fallis confess to murdering Ashley Fallis.

*Id.* ¶¶ 76, 80-89, 91-97 (emphasis in original).

Plaintiffs bring a Fourteenth Amendment due process claim pursuant to 42 U.S.C.

§ 1983 against all Defendants. *Id.* ¶¶ 182-212. Plaintiffs rely on certain Colorado statutes

in support of this claim, specifically, Colo Rev. Stat. §§ 15-11-803[6], 15-12-203[7], 13-21-201[8], 15-14-101[9], 13-81-101[10], 13-81-101.5[11], and 19-1-117[12]. *Id.* ¶¶ 193-199.  Plaintiffs argue that "Defendants' conduct greatly prejudiced [their] chances of prevailing in legal actions, as the herein described obstruction and hindrance of justice, concealment, suppression and alteration of evidence caused delay, which could lead to stale evidence and the fading of material facts in the minds of potential witnesses, and increased litigation expenses." *Id.* ¶ 200.  In short, this is a due process claim premised on Plaintiff's lack of access to the courts to pursue various statutory rights.  Plaintiffs further argue that Defendants violated the "stigma plus" doctrine "by falsely publicizing or influencing the publicizing or initial pronouncement of their daughter's death as a suicide by both the Evans Police Department and the Weld County Coroner's office, thereby stigmatizing Plaintiffs, accompanied by altering, burdening, thwarting and interfering with their tangible interests, property rights, and legal status under the Constitution and statutory schemes referenced specifically in this Claim for Relief." *Id.* ¶ 203.  In short, this is a liberty interest claim relating to the stigma associated with designation of Ashley Fallis' death as a suicide.  Plaintiffs bring a second

---

[6]  Regarding their access to the courts.

[7]  Relating to intestate succession.

[8]  Relating to rights of familial association with their grandchildren.

[9]  Governing rights to establish guardianship of their three grandchildren.

[10]  Governing access to the courts.

[11]  Regarding their ability to be appointed as personal representatives to represent the interest of their three grandchildren.

[12]  Governing grandparent rights.

claim for willful and wanton outrageous conduct against Defendants Yates, Phipps, Parkos, Reams, and Wood. *Id.* ¶¶ 213-27. As a result, Plaintiffs seek compensatory damages, consequential damages, special damages, actual damages, punitive damages, attorney's fees, costs, pre-judgment interest, and post-judgment interest. *Id.* at 38.

## B.   The Evans Motion

In the Evans Motion, the Evans Defendants argue that under applicable, binding authority, "a deliberate cover-up of evidence does not violate the 14th Amendment." *Evans Motion* [#32] at 4 (citing *Lynch v. Barrett*, 703 F.3d 1153, 1161-62 (10th Cir. 2013), *cert. denied*, ––– U.S. –––, 133 S.Ct. 2352 (2013)). Therefore, they argue that no constitutional right has been violated. *Id.* at 5. Alternatively, the Evans Defendants argue that they are entitled to qualified immunity because the alleged right was not clearly established at the time. *Id.* With regard to Plaintiffs' allegation that their reputations were harmed, the Evans Defendants argue that Plaintiffs fail to plead an essential element—publication—as to all Evans Defendants except Defendant Haugse. *Id.* at 6. With regard to Defendant Haugse's statement that Ashley Fallis committed suicide, the Evans Defendants argue that this statement "did not [ ] impugn her parents' good name, reputation, honor, or integrity in any way." *Id.* Rather, they maintain that the statement "is completely neutral vis-á-vis her parents' reputation." *Id.* In addition, they argue that the statement does not alter Plaintiffs' legal status. *Id.* at 7. Alternatively, the Evans Defendants argue that Defendant Haugse is entitled to qualified immunity with regard to this claim because Plaintiffs' alleged right was not clearly established at the time the statement was made. *Id.* With regard to Plaintiffs' allegation that Defendant Brandt failed to supervise or failed to train his employees, the Evans Defendants argue that any such claims fail because the underlying constitutional

8

claims fail. *Id.* Finally, the Evans Defendants aver that the outrageous conduct claim fails as a matter of law because Plaintiffs' allegations with regard to various statements establish that the conduct does not satisfy the basic elements of outrageous conduct. *Id.* at 8.

In the Evans Response, Plaintiffs cite to a string of cases to support their contention that the Defendants' conduct allegedly violated their constitutional rights and that such rights were clearly established. They maintain that "the Evans Defendants intentionally engaged in evidence destruction, extraordinary evidence concealment and manufacture that included their immediate stigmatizing news pronouncements that this vibrant woman with three young children in her trust decided to kill herself" and argue that case law makes clear that such conduct violates their right of access to the courts. *Evans Response* [#43] at 11. Plaintiffs further argue that *Lynch*, the case the Evans Defendants cite to heavily in support of their position, addresses whether the rights were clearly established at the time, not whether the rights were violated. *Id.* at 14. Defendants also distinguish *Lynch*. *Id.* They note that there is a distinction between "code of silence" cases and cases in which there is an intentional concealment of information or destruction of evidence. *Id.* at 15. With regard to their reputational claim, Plaintiffs argue that they sufficiently pled the elements of a liberty interest. *Id.* at 18. Plaintiffs further maintain that even if their underlying constitutional claims were subject to dismissal, the claim against Defendant Brandt in his official capacity may proceed. *Id.* at 20. Finally, Plaintiffs argue that they have sufficiently alleged an outrageous conduct claim. *Id.* at 20-25. Plaintiffs argue that the Evans Defendants do not correctly state the elements of this claim. *Id.*

In the Evans Reply, the Evans Defendants focus on *Lynch*. They argue that *Lynch* dictates that the law was not clearly established at the time of that decision, January 2013,

and that a case relied on by Plaintiffs, *Stump v. Gates*, 986 F.2d 1429 (10th Cir. 1993), is unpublished and, therefore, can not be used to show that the right was clearly established. *Evans Reply* [#46] at 2-3. Notably, the Evans Defendants state: "The officers herein agree that if *Stump* were the law in January[ ] 2013, when the incident herein occurred . . . the officers would probably not have qualified immunity." *Id.* at 2. The Evans Defendants also argue that any case Plaintiffs rely on from another circuit "is unavailing because the determination of whether the law was clearly established in Colorado focuses first on Supreme Court precedence [sic] and then on 10th Circuit precedence [sic]." *Id.* at 3. Finally, the Evans Defendant revisit their arguments regarding the liberty interest claim and the outrageous conduct claim.

## C.     The Weld Motion

In the Weld Motion, the Weld Defendants argue that Plaintiffs' constitutional claims fail as a matter of law and that they are entitled to qualified immunity with regard to both the due process and the liberty interest claims. *Weld Motion* [#44] at 3-12. In addition to the arguments made by the Evans Defendants, the Weld Defendants maintain that Plaintiffs have asserted their rights in the state courts and, therefore, have had access to the courts. *Id.* at 6-7. They further argue that with regard to their grandchildren's legal rights, Plaintiffs may still pursue such claims in state court because the limitations period is tolled. *Id.* at 7. The Weld Defendants further argue that the state law tort claim must be dismissed because Plaintiffs failed to give statutorily mandated written notice of the claim in a timely manner. *Id.* at 3, 12-15. In addition, the Weld Defendants request an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b); Colo. Rev. Stat. §§ 13-16-113(2), 13-16-122, 13-17-201. *Id.* at 15.

In the Weld Response, Plaintiffs argue that it was clearly established at the time of the alleged conduct that "intentional conduct by law-enforcement to conceal and destroy evidence may infringe the right of access to courts." *Weld Response* [#55] at 6. Plaintiffs revisit the various cases relied on by the parties in the briefing of both Motions. *Id.* at 6-12. With regard to the Weld Defendants' request for attorneys' fees, Plaintiffs argue that their allegations are not frivolous. *Id.* at 12. With regard to the Weld Defendants' arguments regarding Plaintiffs' ability to pursue their legal rights moving forward, Plaintiffs maintain that *timely* access to the court is the issue and that the Weld Defendants' actions denied them meaningful access to the courts. *Id.* at 13-14. Plaintiffs further argue that they are unable to bring certain causes of action in court at this juncture because they lack standing. *Id.* at 14. Plaintiffs aver that they have properly plead a violation of their liberty rights under the "stigma plus" doctrine. *Id.* at 14-15. Plaintiffs further argue that "proper certified notice was given to and received by the Weld County Commissioners and Weld County Attorney(s) in August, 2014 and 2015 . . ." and attach two exhibits to support this contention. *Id.* at 3; *Weld Response, Ex. 1* [#55-1]; *Weld Response, Ex. 2* [#55-2]. Plaintiffs maintain that they "did not discover they had been wrongfully injured until April 2014" and that because they argue that Defendants wrongfully concealed information, the date of Ashley Fallis' death cannot be the accrual date for purposes of providing notice under the Colorado Governmental Immunity Act, Colo. Rev. Stat. § 24-10-109, ("CGIA"). *Id.* at 16-18.

In the Weld Reply, the Weld Defendants revisit the case law regarding whether the alleged Fourteenth Amendment right asserted by Plaintiffs was clearly established at the time of Defendants' actions. *Weld Reply* [#64] at 2-6. The Weld Defendants also revisit

their argument regarding Plaintiffs' ability to access the courts going forward.  They argue that there is no timeliness requirement for an access claim.  *Id.* at 7-8.  The Weld Defendants argue that Plaintiffs "offer no legal support to show that they were either stigmatized or deprived [of] liberty interests" because of their actions.  *Id.* at 8.  Finally, the Weld Defendants argue that the CGIA's notice provision "is a strict jurisdictional bar to suit" and that "arguments of estoppel or equity cannot change the notice period."  *Id.* at 2.  They maintain that "[t]he accrual date for Plaintiffs' state tort is not when they could have discovered the basis of their claims, but when they discovered their injury – emotional distress – which was allegedly wrongful – due to the purportedly incorrect suicide designation of their daughter."  *Id.* at 10.  As a result, they argue that Plaintiffs were required to provide notice of their state tort claim under the CGIA in 2013.  *Id.*

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell*

12

*Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted).

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n][ ]that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 552 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

## III. Analysis

To the extent they are named in their individual capacities, Defendants assert qualified immunity from Plaintiffs' Fourteenth Amendment claims against them. *Evans Motion* [#32] at 7; *Weld Motion* [#44] at 8. All Defendants argue that Plaintiffs' Fourteenth Amendment claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiffs fail to allege a violation of a constitutional right. *Evans Motion* [#32] at 4-5; *Weld*

13

*Motion* [#44] at 4-6.  The analysis conducted under the first prong of the qualified immunity

test is identical to the analysis the Court engages in pursuant to Fed. R. Civ. P. 12(b)(6)

when examining constitutional claims.  Further, "qualified immunity does not come into play

if there has been no constitutional or statutory violation,"  *Hawker v. Sandy City Corp.*, 591

F.App'x 669, 672 n.5 (10th Cir. 2014) (unpublished decision).  Accordingly, in this case, the

Court will first address the larger question—whether Plaintiffs have stated a Fourteenth

Amendment claim.  If they have, the Court will then determine whether the Defendants

named in their individual capacities are entitled to qualified immunity.  Finally, the Court will

address the parties' arguments regarding Plaintiffs' liberty interest claim relating to the

stigma associated with designation of Ashley Fallis' death as a suicide and Plaintiffs' claim

for willful and wanton outrageous conduct against Defendants Yates, Phipps, Parkos,

Reams, and Wood.

**A.**    **Fourteenth Amendment Claim** (All Defendants)

    **1.**    **Whether Plaintiffs State a Claim**

The Supreme Court has recognized that the basis for the constitutional right of court

access is "unsettled," but has identified the Privileges and Immunities Clause of Article IV,

the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the

Fourteenth Amendment Equal Protection and Due Process Clauses as sources.  *See*

*Christopher v. Harbury*, 536 U.S. 403, at 415 & n.12 (2002).  The elements of a denial of

court access claim, under any source, appear to be uniform.  *Id.* at 413-16 (discussing the

various roots of the right to court access and the general elements of a court access claim).

As the Tenth Circuit has explained, "intentional, bad-faith destruction or concealment of

14

evidence that burdens a plaintiff's ability to access the courts is an unconstitutional denial of access; and, [ ] allegations that police were negligent in an investigation or that they negligently lost or destroyed evidence will not support a denial of access claim." *Donohue v. Hoey*, 109 F.App'x 340, 357 (10th Cir. 2004) (unpublished Order and Judgment). Therefore, negligent conduct cannot establish a denial of access claim, but intentional destruction of evidence or concealment may.

The Supreme Court has divided court access claims into two categories: "forward looking claims" and "backwards looking claims." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1208 (10th Cir. 2004) (citing *Christopher*, 536 U.S. at 413). Forward looking claims involve official action that "frustrates a plaintiff's ability to bring a suit at the present time," and backwards looking claims "arise when plaintiffs allege that a specific claim cannot be tried . . . because past official action cause[d] the loss or inadequate settlement of a meritorious claim." *Id.* at 1208 (internal quotations omitted). When a court access claim looks backwards, it must "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Christopher*, 536 U.S. at 404. To give a defendant fair notice, a complaint must address the underlying cause of action and its lost remedy. *Id.* at 404.

Whether a claim turns on "a litigating opportunity yet to be gained or an opportunity already lost," the purpose of recognizing a court access claim "is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414-15. "However unsettled the basis of the constitutional right of access to courts," court access cases "rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415.

A plaintiff bringing a court access claim, whether forward or backward looking, must identify a "nonfrivolous, arguable underlying claim." *Id.* at 415 (internal quotation marks omitted); *see Lewis v. Casey*, 518 U.S. 343, 353 & n.3 (1996) ("Depriving someone of an arguable (though not yet established) claim inflicts actual injury because it deprives him of something of value—arguable claims are settled, bought, and sold.  Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions."). The complaint must describe the underlying cause of action, "whether anticipated or lost," and the official action which frustrated the litigation.  *Christopher*, 536 U.S. at 415.   If the plaintiff has a backward looking claim, the complaint "must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* at 415. All elements in a court access claim must be "addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 416 (citing *Swierkiewicz v. Sorema* N.A., 534 U.S. 506, 513-515 (2002)).

In this case, Plaintiffs allege:

Defendants denied and burdened to the point of rendering meaningless Plaintiffs' constitutional rights to timely access and petition a Court in "Civil Proceedings" as "interested persons" to determine that their daughter's death was the result of a "felonious killing" within the meaning of § C.R.S. 15-11-803.

Plaintiffs were therefore unable to: establish the "effect of homicide" on intestate succession, wills, trusts, joint assets, life insurance, beneficiary designations and other statutory benefits as identified in § C.R.S. 15-11-803; establish their priority for appointment as personal representatives of the estate of Ashley Fallis under this statute and § C.R.S. 15-12-203; see to the divestiture of Tom Fallis of any interest in the estate, and; establish her minor children's' rights thereto and to an uncapped claim for wrongful death damages against Tom Fallis.

Defendants additionally burdened to the point of rendering meaningless, thwarted and/or interfered with Plaintiffs' constitutional rights to access courts and exercise their Fourteenth Amendment rights to familial association, which extends protection to grandparents and their grandchildren, and gain sufficient control of their minor grandchildren to credibly bring a wrongful death claim (including for felonious killing) under § 13-21-201 et seq. against Tom Fallis as their next friends or guardians ad litem as provided for under C.R.C.P 17(c).

Defendants also denied and burdened Plaintiffs' constitutional rights to access to courts to establish guardianship of their three grandchildren under C.R.S. § 15-14-101 et seq., who remained in the custody of Tom Fallis and have since been awarded temporary custody to his mother, Anna Fallis.

Individual Defendants also denied and burdened Plaintiffs' constitutional rights to access to court to take action under C.R.S.§ 13-81-101, et seq. to obtain the appointment of a legal representative, including themselves, as personal representatives to represent the interests of their three grandchildren under C.R.S. § 13-81-101.5 as persons under disability.

Under C.R.S. § 13-81-101.5, each child is a "minor under eighteen years of age" who does not have a legal guardian to take action to enforce their [sic] rights, including bringing, commencing, maintaining, prosecuting actions and suits to protect and assert their [sic] interests.

Finally, Defendants also burdened and thwarted their meaningful access to their grandparent rights under C.R.S. § 19-1-117, including supporting Tom Fallis in such proceedings.

*Second Am. Compl.* [#22] ¶¶ 193-99.

The Weld Defendants argue that "[t]here is no dispute that individuals have a constitutional right to access courts . . . . [b]ut the Supreme Court and Tenth Circuit have never recognized that such a right can be deprived by an alleged law enforcement cover-up." *Weld Motion* [#44] at 4 (citing to *Lynch*, 703 F.3d at 1161-63).  Similarly, the Evans Defendants cite to *Lynch* for the argument that "there is no constitutional deprivation of access to court based upon a lack of evidence caused by a police officer, even if that lack of evidence was intentional and done pursuant to a 'code of silence' to protect another

officer." *Evans Motion* [#32] at 5.   However, these argument ignore *Christopher* and the

the Tenth Circuit's actual analysis in *Lynch*.   As noted above, *Christopher* laid out the

requirements for a backward looking denial of access to the courts claim.   *Christopher*, 536

U.S. at 404.   In *Lynch*, the Tenth Circuit noted that "[a] backwards looking access claim

*may* arise where a plaintiff alleges an underlying claim cannot be tried, or be tried with all

the evidence, because official conduct caused the loss or inadequate resolution of that

claim." *Lynch*, 703 F.3d at 1157 (emphasis in original) (citation omitted).   In that case, the

defendants did not challenge the Court's determination that the plaintiff's constitutional right

was violated and the Tenth Circuit assumed:

> (1) a police cover-up designed to hinder pursuit of a legal claim may violate
> an individual's constitutional right to court access and (2) the facts set forth
> in the district court's order are sufficient to warrant a finding that Defendant
> Officers violated Plaintiff's right in this case. This allows us to broach the
> more manageable question of whether Plaintiff's right to court access was
> clearly established in the specific context of this case.

*Id.* at 1160.   The Tenth Circuit's analysis in *Lynch*, therefore assumed the opposite of what

Defendants argue here and focused only on the second prong of the qualified immunity

analysis.

Here, Plaintiffs describe the underlying causes of action, "whether anticipated or

lost," and the official action which frustrated their potential litigation.  *Christopher*, 536 U.S.

at 415.   This meets the requirements described by the Supreme Court for a backward

looking claim.   The Court, therefore, concludes that Plaintiffs have sufficiently alleged a

Fourteenth Amendment claim of denial of access to the courts.

### 2.    Whether Plaintiffs Have Accessed the Courts

In addition to the arguments made by the Evans Defendants, the Weld Defendants

18

maintain that Plaintiffs have asserted their rights in the state courts and, therefore, have had access to the courts.  *Weld Motion* [#44] at 6-7.  They further argue that with regard to their grandchildren's legal rights, Plaintiffs may still pursue such claims in state court because the limitations period is tolled.  *Id.* at 7. The Court agrees that Plaintiffs cannot bring a denial of access claim premised on an underlying claim that "may yet be brought." *Christopher*, 536 U.S. at 415.  However, the Motions before the Court seek dismissal under Fed. R. Civ. P. 12 and the Court must examine the allegations of the Second Amended Complaint when determining whether Plaintiffs' constitutional claim can move forward at this initial stage of the litigation.  The Court notes that the standard for stating a denial of access to the courts claim simply requires that Plaintiffs provide notice to Defendants of at least one legal claim they cannot now pursue because of Defendants' alleged actions.  In this case, Plaintiffs include citations to a variety of statutes that they argue include rights that could have pursued in court that are now foreclosed.  However, if the Court determines that even one of those avenues has been foreclosed as a result of Defendants' alleged actions, that is sufficient for purposes of the Court's analysis of the Motions.

Plaintiffs allege that as a result of Defendants' actions, Tom Fallis maintained custody of his children, their grandchildren, and that his mother, Anna Fallis, was later awarded temporary custody.  *Second Am. Compl.* [#22] ¶¶ 141.  As a result, the Court's analysis of this argument is limited.  There can be no question that the designation of Ashley Fallis' death as a suicide prevented Plaintiffs from asserting rights under Colo. Rev. Stat. § 15-11-803 (governing the effect of homicide on intestate succession, wills, trusts, joint assets, life insurance, and beneficiary designations) and Colo. Rev. Stat. § 15-21-203 (governing the priority among persons seeking appointment as personal representative).

19

Ashley Fallis died in 2012 and it wasn't until 2014 that the investigation was reopened and the suicide designation was changed to homicide.  Further, as Plaintiffs' note, they cannot bring any claims on behalf of their grandchildren because they would not have standing. *Weld Response* [#55] at 14.  Plaintiffs allege that Anna Fallis has been awarded custody. *Second Am. Compl.* [#22] ¶¶ 141.  Under Colo. R. Civ. P. 17(c), "[w]henever an infant or incompetent person has a representative, such as a general guardian, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person."  Finally, to the extent Defendants speculate or offer conclusory arguments regarding claims Plaintiffs could pursue in other forums, the Court will not delve into that wormhole.  It is sufficient at this stage of the proceedings that the Court has determined that, based on Plaintiffs' allegations, there are legal claims that have been foreclosed to them.

**B.    Qualified Immunity** (Individual Capacity Defendants)

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A motion based on a claim of qualified immunity imposes the burden on the plaintiff to show "both that a constitutional violation occurred and that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (internal quotations omitted).  As recently reiterated by the Tenth Circuit,

> "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the

plaintiff maintains." *Fogarty*, 523 F.3d at 1161 (quotations omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quotations omitted).

*Henderson v. Glanz*, — F.3d —, 2015 WL 9463088 (10th Cir. Dec. 28, 2015). The Tenth Circuit "uses a 'sliding scale' system in which 'the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Tenorio v. Pitzer*, 802 F.3d 1160, 1174 (10th Cir. 2015) (J. Phillips dissenting) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). In *Saucier v. Katz*, the Supreme Court emphasized that determining whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Shortly after *Saucier*, the Supreme Court reiterated in *Hope v. Pelzer* that "the salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 730 (2002) (modifications in original).

Therefore, the Court turns to case law to determine if Defendants were on notice as of January 2012 that their alleged conduct was unconstitutional. In 1993, the Tenth Circuit was faced with a case that is very similar to the instant case. *See Stump v. Gates*, 986 F.2d 1429 (table decision) (10th Cir. 1993). In *Stump*, the decedent was found dead in his home and the death was reported as a suicide. *Id.* at *1. After "allegations of impropriety prompted a grand jury investigation," the decedent's children filed a civil lawsuit asserting a claim that the relevant chief of police and a detective violated their right of access to the courts. *Id.* The allegations against the defendants included:

> (1) the Arapahoe County Coroner was initially barred from entering the [decedent's home on May 20, 1984; (2) no autopsy was ordered or performed; (3) ballistics tests were not ordered or performed; (4) [decedent's wife] was not interviewed by the police until May 28, 1984, eight days after her husband's death; (5) [decedent's] hands were not bagged to preserve evidence for a trace metal detection test (TMDT); (6) the results of the TMDT performed on [decedent] were not compared to the weapon found in his hand; (7) no TMDT or antimony testing was performed on [decedent's wife]; (8) no fingerprint testing for comparison to fingerprints other than [decedent's] was performed; (9) at [decedent's wife's] request, the two guns and other evidence seized from the Ocrant home were destroyed by the Greenwood Village Police Department on June 1, 1984.

*Stump v. Gates*, 777 F.Supp. 808, 813-14 (D. Colo. 1991), *aff'd* 986 F.2d 1429 (10th Cir. 1993).  A grand jury was convened and concluded that the death was a homicide.  *Id.* at 814.  In *Stump*, this Court held that the plaintiffs' right of access to the courts was clearly established at the time of the alleged improprieties and denied qualified immunity.  *Id.* at 822.  The Tenth Circuit affirmed that decision.  It explained:

> In reviewing the grant or denial of qualified immunity, this court must "determine whether defendants violated 'clearly established statutory or constitutional rights of which a reasonable person would have known' at the time the challenged conduct occurred." *Patrick*, 953 F.2d at 1243 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The test is one of objective reasonableness, in light of the law at the time of the alleged violation. *Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992). The burden is on the plaintiffs to show that the law was clearly established at the time of the alleged violation. *Patrick*, 953 F.2d at 1243; *Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir. 1991). "For plaintiffs to defeat a claim of qualified immunity, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Snell v. Tunnell*, 920 F.2d 673, 696 (10th Cir. 1990) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), *cert. denied*, 111 S.Ct. 1622 (1991).

> In order for a right to have been clearly established, this court requires "some, but not necessarily precise, factual correspondence" between cases predating the alleged violation and the facts of the case in question. *Calhoun v. Gaines*, No. 91-6152, 1992 WL 387385, at *4 (10th Cir.  Dec. 30, 1992). "In essence, this standard requires officials to know well developed legal principles and to relate and apply them to analogous factual situations." *Id.* The parties naturally characterize the qualified immunity issue differently. We

22

believe, however, that the appropriate statement of that issue in the context of the allegations of this complaint is whether a reasonable officer would have known at the time of Ocrant's death that a deliberate failure to investigate and quick destruction of evidence that might have proved homicide was a violation of the decedent's children's right of access to the courts.

*Stump*, 986 F.2d 1429, at *2.  The Court made clear that:

> [A]ll that is before us are the allegations of the complaint, alleging deliberate action and conspiracy, which we must take as true. We believe that any reasonable officer would have known that if the conduct occurred as alleged by plaintiffs in this case, it would violate the constitutional rights of the decedent's children. *Cf. DeLoach v. Bevers*, 922 F.2d 618, 621-23 (10th Cir. 1990) (denying qualified immunity to police officer on § 1983 claims in light of deliberate conduct amounting to coverup), *cert. denied*, 112 S.Ct. 65 (1991). Further, the facts set out in the complaint are specific enough--create enough of an inference of wrongdoing--to warrant denial of the motion for dismissal on the pleadings.

*Id.* at *3.

As is clear from the Court's above summary, the facts of *Stump* are very similar to the instant case.  Police officers reported to the scene of a crime, did not preserve evidence, destroyed evidence, the death was reported as a suicide, and a later investigation indicated that it was a homicide.  Defendants argue that *Stump* should be disregarded because it is not a published opinion and the Tenth Circuit was aware of it and did not discuss it in *Lynch*.  *Evan Reply* [#46] at 2-3; *Weld Reply* [#64] at 3-4.  It is true that the Tenth Circuit did not discuss *Stump* in *Lynch*, however, as discussed below that is likely because *Lynch* is distinguishable from both *Stump* and the instant case.  Further, the question before the Court is "whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional."  *Hope*, 536 U.S. at 730 (modifications in original).  Knowledge of the state of the law can be based on Supreme Court authority, Tenth Circuit authority, or "the clearly established weight of authority from

other courts." *Henderson*, 2015 WL 9463088, at *9.

In *Stump*, the Tenth Circuit noted that other circuit courts had issued decisions by 1993 that supported the outcome there.  986 F.2d 1429, at *3.  Similarly, here, Plaintiffs point to the more recent decisions of other circuit courts addressing this issue.  *Evans Response* [#43] at 2-3.  The Fifth Circuit, Seventh Circuit, and Ninth Circuit recognize a constitutional right of access to the courts based on the bad faith destruction of evidence. *Webster v. City of Houston*, 735 F.2d 838, 846 (5th Cir. 1984); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1260-66 (7th Cir. 1984); *Karim-Panahiv. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir. 1988).  The Eighth Circuit recognizes a denial of access to the courts cause of action for falsifying evidence  *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 850-54 (8th Cir. 2013).  The Seventh Circuit has the best-developed line of cases.  It draws a distinction based on the degree of damage to the plaintiffs' underlying claim rather than the nature of defendant's misconduct. *See Bell*, 746 F.2d at 1260-66 (finding right to access courts violated where police both fabricated and destroyed evidence to cover-up a police shooting for 20 years); *Thompson v. Boggs*, 33 F.3d 847, 852 (7th Cir. 1994) (distinguishing *Bell* because the material facts could still be discovered in time to file a suit); *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995) (same); *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015) (same). The Eleventh Circuit follows suit. *Chappell v. Rich*, 340 F.3d 1279, 1284 (11th Cir. 2003) (finding no claim where underlying facts were still available to plaintiff in time to file claim). Likewise, in the First, Third, Fourth, Fifth, Sixth, and Ninth Circuits—which, unlike the Tenth Circuit, explicitly recognize denial of access to the courts claims based on merely concealing or intentionally failing to develop evidence—the analysis focuses on the damage

24

done to the plaintiff's case. *See, e.g., Germany v. Vance*, 868 F.2d 9, 16 (1st Cir. 1989); *Estate of Smith v. Marasco*, 318 F.3d 497, 511-12 (3d Cir. 2003); *Pollard v. Pollard*, 325 F. App'x 270, 272 (4th Cir. 2009); *Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844, 851 (5th Cir. 1991); *Ryland v. Shapiro*, 708 F.2d 967, 974-75 (5th Cir. 1983); *Flagg v. City of Detroit*, 715 F.3d 165, 173-75 (6th Cir. 2013); *Swekel v. City of River Rouge*, 119 F.3d 1259, 1264 (6th Cir. 1997); *DeLew v. Adamson* (DeLew II), 293 F. App'x 504, 506 (9th Cir. 2008); *DeLew v. Wagner* (DeLew I), 143 F.3d 1219, 1222-1223 (9th Cir. 1998). Here, Plaintiffs' allegations cover all of the prescribed conduct. They maintain that Defendants falsified evidence, destroyed evidence, and that they cannot now bring certain statutory claims as a result of Defendants' actions. In this Court's view, *Stump* in addition to the various cases from other circuits as applied to the factual allegations in this case are enough for the Court to find that Defendants were on notice that their alleged actions would violate Plaintiffs' constitutional rights. However, in an effort to provide a complete analysis, the Court briefly turns to other Tenth Circuit cases Defendants focus on.

In *Jennings v. Stillwater*, which pre-dates *Lynch*, the Tenth Circuit applied the backward and forward looking categories to a case alleging that destruction of a rape kit, as well as police officers' investigative omissions and irregularities, violated the plaintiff's right to court access because she was deprived of her ability to pursue claims against the football players who allegedly raped her. *See* 383 F.3d 1199, 1200 (10th Cir. 2004). When examining the plaintiff's claims in *Jennings*, the Tenth Circuit analyzed *Christopher v. Harbury,* noting that

> Rather than addressing whether Plaintiff's allegations stated a constitutional cause of action, the Supreme Court assumed that an "access-to-the-courts" claim existed, and then proceeded to discuss the elements of this assumed

claim. *Id.* at 412-22, 122 S.Ct. 2179. The Court divided access-to-the courts claims into two categories. *Id.* at 413, 122 S.Ct. 2179. The first, termed "forward looking claims," are cases where official action frustrates a plaintiff's ability to bring a suit at the present time. Id. Classic examples include suits claiming that the denial of law library privileges prevents prisoners from effectively filing claims of alleged prison abuse. *Id.* The second class, termed "backwards looking claims," arise when plaintiffs allege that a specific claim "cannot be tried (or tried with all the evidence) [because past official action] caused the loss or inadequate settlement of a meritorious case." *Id.* at 413-14, 122 S.Ct. 2179. In this way, the official action is said to have " 'rendered hollow [the plaintiff's] right to seek redress' " in the courts. *Id.* at 414, 122 S.Ct. 2179, quoting *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) (brackets in original). *1209 At least some courts have conceptualized this harm as a denial of access to the courts. *See, e.g., Ryland v. Shapiro*, 708 F.2d 967, 971-73 (5th Cir. 1983); *Bell*, 746 F.2d at 1260-61.

The Supreme Court was careful not to endorse the validity of these backwards looking claims. Rather, in the course of describing various forms of access-to-courts cases decided in the lower courts, the Supreme Court dropped a footnote stating: "[s]uch cases have been decided in the Courts of Appeals; we assume without deciding the correctness of the decisions." *Harbury*, 536 U.S. at 414 n.9, 122 S.Ct. 2179 (citations omitted). *Harbury* did not cite any Tenth Circuit precedents. 536 U.S. at 413 nn.7, 8, 122 S.Ct. 2179.

While *Harbury* was careful not to endorse the backwards looking claim, it held that an element of any backwards looking claim is for the complaint to "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." 536 U.S. at 415, 122 S.Ct. 2179. The Court's rationale was that there is "no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.*

*Jennings*, 383 F.3d at 1209. The Tenth Circuit rejected the plaintiff's backward looking claim, noting that any remedy "that could conceivably be awarded to Plaintiff as a result of the alleged police misconduct" had already been sought and obtained in a suit against Oklahoma State University and the four football players who had allegedly raped her. *Id.* at 1209. As a result, the Tenth Circuit did not need to reach the question of whether the plaintiff's right was clearly established at the time. Therefore, *Jennings* is distinguishable

26

because it never addressed the question at issue in the instant case.

Lynch involved a "conspiracy of silence," rather than destruction of evidence.  In

Lynch, the plaintiff alleged that he was subjected to excessive force by a police officer.

Lynch, 703 F.3d at 1155.  He brought his denial of access to the courts claim because the

police officers who were dispatched to the location where the alleged excessive force was

used on the plaintiff refused to disclose which police officer was involved.  Id.  The Lynch

court focused on the second prong of the qualified immunity analysis:

> [W]e now simply assume (1) a police cover-up designed to hinder pursuit of
> a legal claim may violate an individual's constitutional right to court access
> and (2) the facts set forth in the district court's order are sufficient to warrant
> a finding that Defendant Officers violated Plaintiff's right in this case.

Id. at 1160 (emphasis in original).  As the Tenth Circuit summarized:

> Plaintiff must show the scope of his right to court access was sufficiently
> clear such that a reasonable officer would have understood Defendant
> Officers' refusal to name those responsible for exercising excessive force
> against him was not merely ill-advised, but violated that right:
>
> > Because the focus is on whether the officer had fair notice that
> > her conduct was unlawful, reasonableness is judged against
> > the backdrop of the law at the time of the conduct. If the law at
> > that time did not clearly establish that the officer's conduct
> > would violate the Constitution, the officer should not be subject
> > to liability or, indeed even the burdens of litigation.
> >
> > It is important to emphasize that this inquiry must be
> > undertaken in light of the specific context of the case, not as a
> > broad general proposition.

> Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583
> (2004) (internal quotations omitted). If a reasonable officer would have had
> difficulty determining how the law concerning the right to court access applied
> to the facts of this case, Defendant Officers are entitled to qualified immunity.
> All this is not to say that qualified immunity shields official action unless
> controlling precedent squarely holds the challenged action unlawful; rather
> "in the light of pre-existing law the unlawfulness must be apparent." Hope v.
> Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal

quotations omitted).

*Lynch*, 703 F.3d at 1161.  Ultimately, the *Lynch* court found that

> [a]t least in the Tenth Circuit, the question of whether an evidentiary cover-up
> by police officials may violate an individual's constitutional right to court
> access was not clearly established at the time of the alleged violation. A
> reasonable officer might not have understood what Defendant Officers did (or
> refused to do) violated that right. "[I]n the light of pre-existing law," the
> unconstitutionality of Defendant Officers' misfeasance simply was not clear.
> *Hope*, 536 U.S. at 739, 122 S.Ct. 2508. In other words, whether the scope
> of the right to access extended as far as Plaintiff claims was "far from
> obvious." *Pearson*, 555 U.S. at 237, 129 S.Ct. 808. What is obvious is that
> such right as defined by Plaintiff was not clearly established. Assuming the
> truth of Plaintiff's version of events, Defendant Officers' conduct is
> inexcusable. "But that we are 'morally outraged' . . . by the alleged conduct
> . . . does not mean necessarily that the offic[ers] should have realized that it
> violated a constitutional right of access." *Foster*, 28 F.3d at 430.

*Lynch*, 703 F.3d at 1162.  While this language is broadly construed by Defendants to argue

that Plaintiffs fail to state a claim, or alternatively that  Defendants are entitled to qualified

immunity because the right asserted was not clearly established, Defendants paint with too

broad a brush.  *Lynch's* facts are manifestly distinguishable from the instant case. Here,

Defendants' alleged obstruction includes the destruction of evidence, the deliberate refusal

to develop evidence, and the falsification of evidence.  For example, Plaintiffs allege:

> Defendant Paul Wood, acting, on information and belief, at the instruction of
> Sheriff Reams who was supervising, gave multiple orders at the scene to
> Weld County deputies, including justice obstructing orders not to write reports
> regarding what they saw, heard or learned and when to leave the residence.

> Despite conscious awareness of the involvement and knowledge of the Weld
> County Sheriff Department personnel, the Evans Police Department officers
> involved did not interview such officers, include information reported to them
> or request reports from them and no such involved Sheriff's department
> personnel prepared such reports.

> A neighbor and witness, Nick Glover, was interviewed by Officer Yates and
> told him that he overheard Tom Fallis confess to his parents that he
> murdered his wife, as reported by Fox31 News in April 2014.

28

Nick Glover reportedly told Defendant Yates that he distinctly heard him say, "I shot her." More specifically, during his interview with Officer Yates, shared, on information and belief, with the other individual defendants, Mr. Glover reported that he heard the following incriminating exchange immediately after the shooting between Mr. Fallis and his parents that Officer Yates is believed to have written down:

• Mr. Fallis: "Oh my God, I can't believe I did it. Oh my God, what have I done. What have I done."
• Mr. Fallis' parents: "What. What are you saying."
• Mr. Fallis: "I shot her."

Outrageously, Officer Yates and/or other involved Defendants or Evans police officers consciously decided to not include this highly incriminating confession witnessed by Mr. Glover or that a confession by Tom Fallis was also heard by other officers in their official report.

Officer Yates, on information and belief, supported and/or supervised by the other individual defendants, additionally altered/destroyed another witness's original reporting of the shooting, changing her report from a highly incriminating account into a manufactured suicide account.

*Second Am. Compl.* [#22] ¶¶ 76, 78, 80-84. *Lynch* involved only a "conspiracy of silence;" in sum, a refusal to disclose evidence. Moreover, one of the two cases *Lynch* most relied on involved only the negligent, rather than intentional, destruction of evidence. *See Wilson v. Meeks*, 52 F.3d 1547, 1556-58 (10th Cir. 1995). The other case, *Jennings*, is discussed above and was resolved on other grounds. *Jennings*, 383 F.3d at 1208-09. As a result, the Court concludes that *Lynch* is distinguishable from the instant case and does not entitle Defendants to qualified immunity in this case.[13]   As a result, the Court respectfully recommends that to the extent the Evans Motion [#32] and the Weld Motion [#44] argue

_____

[13] The Court acknowledges Judge Arguello's Order [#83] in *Saxton v. Lucas*, Civil Action No. 15-cv-00255-CMA-MJW, holding that plaintiffs' claims against police officers who allegedly destroyed evidence and incompetently investigated a case were barred by qualified immunity because *Lynch* held that the law regarding whether an evidentiary cover-up by police officials violated a person's right to court access was not clearly established. *Id.* at 8.  Like *Lynch*, the facts in *Saxton* included no allegations of deliberate falsification of evidence by police officers, contrary to Plaintiffs' assertions here.  As a result, the undersigned respectfully holds that a different conclusion should be reached here, in light of the authorities mentioned above.

that the individually named Defendants are entitled to qualified immunity, the Motions should be denied.

**C.      Stigma-Plus Claim** (All Defendants)

With regard to Defendant Haugse's statement that Ashley Fallis committed suicide, the Evans Defendants argue that this statement "did not [ ] impugn her parents' good name, reputation, honor, or integrity in any way." *Evan Motion* [#32] at 6.  Rather, they maintain that the statement "is completely neutral vis-á-vis her parents' reputation." *Id.* In addition, they argue that the statement does not alter Plaintiffs' legal status.  *Id.* at 7. Alternatively, the Evans Defendants argue that Defendant Haugse is entitled to qualified immunity with regard to this claim because Plaintiffs' alleged right was not clearly established at the time the statement was made.  *Id.*  The Weld Defendants similarly argue that Plaintiffs fail to state this claim because "[r]eputational harm, standing alone, is insufficient to sustain a stigma-plus claim because it lacks the 'plus' element." *Weld Motion* [#44] at 9.   Plaintiffs maintain that "Defendants violated Plaintiffs['] rights by falsely publicizing or influencing the publicizing of their daughter's death as a suicide, thereby stigmatizing Plaintiffs' family name, accompanied by altering, burdening, thwarting and interfering with their tangible interests, property rights, and legal status under the Constitution and statutory schemes referenced" in the Second Amended Complaint. *Evans Response* [#43] at 18.

The Supreme Court recognized in *Paul v. Davis*, 424 U.S. 693 (1976), that government defamation resulting in an alteration in legal status may implicate a liberty interest under the Due Process Clause of the Fourteenth Amendment.  *Id.* at 711-12. Known as the "stigma plus" standard, *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir.

2011), the claim requires a change in an individual's legal status plus the stigma suffered

from the government defamation.  *See Paul*, 424 U.S. at 711-12.  As the Tenth Circuit has

explained it,

> There are two elements of a stigma-plus claim: (1) governmental defamation and (2) an alteration in legal status. *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citing *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). When these two elements are present, the government may have "violate[d] a liberty interest that triggers a procedural due process protection." *Id.* The stigma-plus authorities emphasize that "defamation, standing alone, [is] not sufficient to establish a claim for deprivation of a liberty interest." *Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 726 (10th Cir. 2000). There must be a change of legal status as well.

*Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012).  "Under the first element, the

defamatory statement must be published."  *Sky Harbor Air Serv., Inc. v. Reams*, 491

F.App'x 875, 886 (10th Cir. 2012) (citation omitted).

As the Weld Defendants note, to the extent that the information that was

disseminated that led to media publications stating that Ashley Fallis committed suicide can

be linked to any of the Defendants, Plaintiffs fail to provide any authority to support the idea

that other individuals, such as her parents, were defamed in order to meet the first element

of a stigma-plus claim.   Further, the Court's own research has not revealed any such

cases.  Further, *Stump* addressed this issue and concluded that:

> Publication of the conclusion of the police and coroner that [decedent's] death was a "probable suicide" is a statement specifically directed at the deceased, not the plaintiffs. While that statement may reflect on the family's name, it is not itself a writing that tends to hold the plaintiffs up to public hatred, contempt or ridicule. Nor does it reflect adversely on their character or reputations.

*Stump*, 777 F.Supp. at 826, *aff'd*, 986 F.2d 1429.  Therefore, the Court concludes that

Plaintiffs fail to state a stigma-plus claim.   As a result, the Court respectfully recommends

that to the extent the Evans Motion [#32] and the Weld Motion [#44] seek dismissal of this claim, the Motions should be granted.

**D.      Failure to Supervise** (Defendant Brandt)

With regard to Plaintiffs' claims that Defendant Brandt failed to supervise or failed to train his employees, the Evans Defendants argue that any such claims fail because the underlying constitutional claims fail. *Evans Motion* [#32] at 7. Because the Court concluded above that the Fourteenth Amendment claims do not fail as a matter of law, this argument fails. Defendant Brandt offers no other arguments in support of dismissal of this claim, and the Court is not inclined to make the argument for him. *See Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009) ("It is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("[D]istrict courts...have a limited and neutral role in the adversarial process, and [ought to be] wary of becoming advocates who comb the record...and make a party's case for it."); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). As a result, the Court respectfully recommends that to the extent the Evans Motion [#32] argues that this claim should be dismissed, the Motion should be denied.

**E.      Willful and Outrageous Conduct** (Defendants Yates, Phipps, Parkos, Reams, and Wood)

**1.      Notice**

The Weld Defendants argue that this state law tort claim must be dismissed because Plaintiffs failed to give statutorily mandated written notice of the claim in a timely manner. *Weld Motion* [#44] at 3, 12-15. Plaintiffs argue that "proper certified notice was given to

and received by the Weld County Commissioners and Weld County Attorney(s) in August, 2014 and 2015 . . ." and attach two exhibits to support this contention.  *Weld Response* [#55] at 3; *Weld Response, Ex. 1* [#55-1]; *Weld Response, Ex. 2* [#55-2].[14]  Plaintiffs maintain that they "did not discover they had been wrongfully injured until April 2014" and that because they argue that Defendants wrongfully concealed information, the date of Ashley Fallis' death cannot be the accrual date for purposes of providing notice under the CGIA.  *Id.* at 16-18.   The Weld Defendants further argue that the notice provision of the CGIA "is a strict jurisdictional bar to suit" and that "arguments of estoppel or equity cannot change the notice period."  *Weld Reply* [#64] at 2.  They maintain that "[t]he accrual date for Plaintiffs' state tort is not when they could have discovered the basis of their claims, but when they discovered their injury – emotional distress – which was allegedly wrongful – due to the purportedly incorrect suicide designation of their daughter."  *Id.* at 10.  As a result, they argue that Plaintiffs were required to provide notice of their state tort claim under the CGIA in 2013.  *Id.*

Under the CGIA, an injured person seeking damages from a public entity or employee must provide written notice of the claim within 180 days of discovery of the injury.

---

[14]  Motions to dismiss are, as a general rule, either facial or factual attacks. *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).  A facial attack challenging the sufficiency of the complaint requires the court to accept the allegations of the complaint as true and assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted. *Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997) (internal citations omitted), *cert. denied*, 522 U.S. 812, (1997).  In a factual attack such as the timeliness of the CGIA notice in this case, the moving party goes beyond the complaint to challenge the facts upon which subject matter jurisdiction is based.  *Holt* 46 F.3d at 1002.  Under a factual attack the court must look beyond the complaint and has wide discretion to allow affidavits, other documents and even testimonial evidence to resolve the disputed jurisdictional facts without the motion being converted into a Fed.R.Civ.P. 56 motion for summary judgment.  *Id.*; *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987), *cert denied* 484 U.S. 986 (1987).

Colo. Rev. Stat. §§ 24-10-109(1), 24-10-118(1)(a).  The failure to comply with the 180-day period is an absolute jurisdictional bar to suit.  *Mesa County Valley Sch. Dist. No. 51 v. Kelsey*, 8 P.3d 1200 (Colo. 2000).  "Unlike under ordinary statutes of limitations, a plaintiff cannot invoke equitable defenses such as waiver, tolling, or estoppel to overcome the CGIA 180-day notice of claim provision."  *City and Cnty. of Denver v. Crandall*, 161 P.3d 627, 633 (Colo. 2007) (en banc) (citation omitted).  Further, "[t]he CGIA is a non-claim statute that does not recognize tolling for those occurrences that are continuous in nature."  *Id.* at 634 (citation omitted).   The burden is on the plaintiff to prove "jurisdictional facts adequate to support subject matter jurisdiction."  *Id.* at 632.

The issue here is the timing of the notice provided by Plaintiffs.  Plaintiffs argue that they "did not discover they had been wrongfully injured until April 2014."  *Weld Response* [#55] at 16.   Plaintiffs provide a copy of their notice which was sent to Defendants on August 18, 2014.  *Weld Response, Ex. 1* [#55-1].  They sent a second notice on April 28, 2015.  *Weld Response, Ex. 2* [#55-2].  They argue that this was sufficient because they "had no notice that they had been 'wrongfully injured' . . . before April 2014, as they were not aware that Defendants' suicide statements were 'wrongful,' involving fabrication, alteration, suppression, tampering with and destruction of evidence."  *Weld Response* [#55] at 16.

The Colorado Supreme Court has made clear that "[f]or purposes of the CGIA, [ ] the notice period is triggered when a claimant has *only discovered* that he or she has been wrongfully injured."  *Gallagher v. Bd. of Trustees for Univ. of N. Colo.*, 54 P.3d 386, 391 (Colo. 2002) (en banc) (emphasis in original) (internal quotation marks and citation omitted).  In *Stump*, the Court addressed the issue of when the notice period was triggered

34

as to the decedent's children and concluded that the plaintiffs discovered the wrong-doing when the grand jury's determination that their father's death was a homicide was communicated to them.  777 F.Supp. at 822-23.  This question of discovery in the instant case is complicated, but clearly Plaintiffs could not have known the basis for their willful and wanton outrageous conduct claim prior to the subsequent investigation because, while they were upset about their daughter's death, they did not know of the alleged actions of Defendants.  While the CGIA's notice requirement must be strictly construed, it does not anticipate that a potential litigant whose feelings are hurt by someone's death must send notice to the city, county, and state just in case it turns out that a government employee was somehow involved in the death despite the lack of such evidence at the time.  As Judge Carrigan held in *Stump*, this is a question of accrual.  While the CGIA's notice requirement is not tolled, it only accrues when a potential litigant has discovered something that would lead him or her to believe he or she has a claim.  *Gallagher*, 54 P.3d at 391.

According to Plaintiffs' allegations, Mr. Joseph's first report relating to his investigation of Ashley Fallis' death aired in April 2014.  *Second Am. Compl.* [#22] ¶¶ 80, 137, 157, 187, 217.  They further allege that they provided the second notice to the Weld Defendants because "[b]etween April 8 and April 15, 2015, [Mr. Joseph] uncovered the conduct . . . by employees of the County of Weld and/or Weld County Sheriff's Department regarding their active participation and conspiracy with the involved officers from the Evans Police Department and others . . . ."  *Id.* ¶ 9.  Plaintiffs allege:

> Due to the ongoing nature of Defendants' conspiracy to violate their constitutional rights, as well as Defendants' concerted bad faith acts to fraudulently conceal such conduct, and obstruct and hinder justice, Plaintiffs did not and could not have, through the exercise of reasonable diligence, discovered the full basis for their claims against Evans Defendants until on

or about April 8, 2014 and, as against the Weld County Sheriff related Defendants, until on or about April 2015, making the doctrines of equitable tolling and fraudulent concealment applicable to the accrual and filing of these claims.

*Id.* ¶ 187.  Plaintiffs, therefore, admit that as of April 8, 2014 that they had some idea that they had been injured by the Evans Defendants.

Defendants' argument that Plaintiffs' had knowledge of their potential claim as of the date of a court hearing is a stretch.  The Weld Defendants maintain that "Plaintiffs' CGIA notice period triggered no later than March 1, 2012."  *Weld Motion* [#44] at 13.  They appear to base this on three paragraphs in the Second Amended Complaint.  Paragraph 136 states: "[Plaintiffs] repeatedly asked the Evans Police Department to not close the investigation, stating that they believed their suicide conclusion was premature."  *Second Am. Compl.* [#22] ¶ 136.  Paragraphs 144 and 145 state:

> In August 2012, the Evans Police Department findings were used by Tom Fallis, with Evans related Defendants' assistance, to burden Plaintiffs grandparents' statutory rights in a contested grandparent rights proceeding in Colorado state court
>
> Tom Fallis and his Counsel urged the Court to deny, limit and burden Plaintiffs' access to obtain grandparent rights by arguing that their fitness was questionable because they were "irrational" for refusing to accept Defendants' findings of suicide, as Tom Fallis and his counsel asserted in such proceedings.

*Id.* ¶¶ 144-45.  These paragraphs make clear that Plaintiffs, grieving parents, did not want to believe and, in fact, did not believe that their daughter committed suicide.  However, they do not establish that Plaintiffs' had any information that would lead them to conclude that they had a tort claim against Defendants.  As a result, the Court concludes, based on the allegations in the Second Amended Complaint, that the CGIA notice deadline as to the

Evans Defendants expired on October 6, 2014.[15]  Plaintiffs provided notice under the CGIA on August 18, 2014.   As a result, Court finds that Plaintiffs complied with the notice provision of the CGIA.[16]  Therefore, the Court respectfully recommends that to the extent the Evans Motion [#32] argues that Plaintiffs failed to comply with the notice requirement of the CGIA, the Motion should be denied.

It is notable that the August 18, 2014 notice was sent to the Weld County Board of County Commissioners and the Weld County Attorney.  *Weld Response, Ex. 1* [#55-1] at 1.  Further, even though Plaintiffs allege that the on-going investigation provided further information which lead to the second notice in 2015, the August 18, 2014 notice informs all recipients that Plaintiffs might bring a claim relating to the investigation.   While the August 18, 2014 notice does not specifically name any Weld Defendant and admittedly focuses on the Evans Defendants, the 2014 notice still makes clear that Plaintiffs had some idea that Weld employees were involved and may have caused them harm.   Under Colorado law, "for purposes of the CGIA, the plaintiff need not yet know the cause of the injury nor must all elements of the claim have ripened before she must file her notice of claim."  *Gallagher*, 54 P.3d at 391.  As a result, the Court concludes that based on their own allegations regarding the new report and the information included in the August 18, 2014 notice, the CGIA notice deadline as to the Weld Defendants also expired on October

---

[15]  This is 180 days after April 8, 2014, the date Plaintiffs allege they had notice of some potential wrong-doing because of the investigatory report.

[16]  The Court notes that in *Gallagher* the Colorado Supreme Court instructed that "[w]hen there is a factual dispute concerning when the plaintiff discovered her injury, an evidentiary hearing is necessary to resolve the dispute. The trial court may also permit limited discovery to decide the notice issue."  54 P.3d at 391.  However, there does not appear to be a factual dispute about Plaintiffs' allegations regarding when they learned about their injuries and the date of the August 18, 2014 notice.  The parties simply argue about how the law should be applied to these facts.

6, 2014.

The Weld Defendants do not argue that the August 18, 2014 notice did not comply with the other requirements of the CGIA.  Further, the CGIA does not require a claimant to provide notice of a claim in such a way as to identify—or even suggest—relevant evidence to the recipient.  For example, the CGIA has not been construed to mandate that the claimant identify the specific legal duty which forms the basis for a claim.  *Neiberger v. Hawkins*, 70 F. Supp. 2d 1177, 1194 (D. Colo. 1999), *aff'd*, 6 F.App'x 683 (10th Cir. 2001), *cert. denied*, 534 U.S. 950 (2001), *reconsideration denied*, 239 F. Supp. 2d 1140 (D. Colo. 2002). Moreover, strict compliance with the notice provision is not required; rather, a claimant satisfies the notice provision if he or she substantially complies with the statute by making a good faith effort to satisfy the notice requirements.  *Villalpando v. Denver Health & Hosp. Auth.*, 181 P.3d 357 (Colo. App. 2007), *cert. denied*, No. 07SC1064, 2008 WL 921297 (Colo. April 7, 2008). The statute has not been construed to mandate that the claimant must describe the circumstances surrounding the claim so thoroughly as to put the recipient on notice of the specific evidence that may be relevant to the claim.  Here, the Court finds that the notice provided the Weld Defendants with the required information even if the underlying facts were undeveloped at the time.  As a result, the Court respectfully recommends that to the extent the Weld Motion [#44] argues that Plaintiffs failed to comply with the notice requirement of the CGIA, the Motion should be denied.

2.      **Elements of the Claim**[17]

Defendants aver that the outrageous conduct claim fails as a matter of law because Plaintiffs' allegations with regard to various statements establish that the conduct does not satisfy the basic elements of outrageous conduct. *Evans Motion* [#32] at 8.  The elements of a claim for outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused the plaintiff to suffer severe emotional distress.  *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994); *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo. 1999) (describing this tort as "intentional infliction of emotional distress by outrageous conduct").  "Outrageous conduct" is defined as conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Culpepper*, 877 P.2d at 882.  "The question of whether certain conduct is sufficiently outrageous is ordinarily a question for the jury." *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. App. 1978). "But it is for the court to determine in the first instance, whether reasonable men could differ on the outrageousness issue." *Id.*  Colorado courts have acknowledged that "'[c]onduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which he has actual or apparent authority over the other . . . .'" Kirk, 674 F.Supp. at 811-12 (quoting *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d

---

[17] "Outrageous conduct and intentional infliction of emotional distress are simply two ways of stating the same claim." *English v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004) (internal quotation marks omitted).

292, 294 (Colo. App.1982)).

Again, the Court turns to Judge Carrigan's opinion in *Stump* for guidance. In that case, the Court concluded that "Plaintiffs have alleged conduct that, in the context of all the trial evidence, a jury could deem outrageous" and denied the motions to dismiss to the extent they sought dismissal of that claim. *Stump*, 777 F.Supp. at 826. In that case, the plaintiffs alleged that police officers failed to properly investigate their father's death and destroyed evidence. *Id.* at 813-14. As a result, a grand jury determined that what had been deemed a suicide was more likely a homicide. *Id.* at 814.

In this case, Plaintiffs allege much more detailed and outrageous conduct by Defendants. They allege that Defendants heard or were aware that Tom Fallis confessed to shooting his wife the night of her death and instructed others not to include that in any official reports. *Second Am. Compl.* [#22] ¶¶ 92-97, 102. Plaintiffs also allege that Defendants altered accounts of witnesses who reported to investigators that they heard Tom Fallis confess to shooting his wife. *Id.* ¶¶ 80-89. Plaintiffs further allege that Defendants purposely ignored evidence of a fight between Tom and Ashley Fallis such as scratches on Tom Fallis' chest. *Id.* ¶¶ 123-28. Such conduct, if true, is objectively more outrageous than the conduct discussed in *Stump* and the Court therefore finds that Plaintiffs meet the pleadings requirements of the first and third elements of this tort.[18]

With regard to the second element, whether "the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress,"

---

[18] Even if these allegations only make it questionable whether the conduct was outrageous, "in close cases . . ., the issue should be resolved by the jury." *Riske v. King Soopers*, 366 F.3d 1085, 1090 (10th Cir. 2004) (citing *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988)).

*Culpepper*, 877 P.2d at 882, the parties do not provide much helpful case law on this question. However, Plaintiffs point to the Restatement (Second) of Torts § 46 for guidance. This Restatement section addresses outrageous conduct causing emotional distress and notes that "[w]here such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress." As the Tenth Circuit noted, "[t]he commentary to Restatement § 46 explains that 'recklessness' . . . includes actions that are in 'deliberate disregard of a high degree of probability that the emotional distress will follow.'" *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 856 (10th Cir. 2005) (quoting Restatement (Second) of Torts § 46 cmt. I). Here, Plaintiffs' allegations as outlined above include a variety of actions allegedly taken by Defendants that a reasonable jury may deem reckless. Accordingly, the Court respectfully recommends that the Evans Motion [#32] and the Weld Motion [#44] be denied to the extent they seek dismissal of Plaintiffs' tort claim pursuant to Fed. R. Civ. P. 12(b)(6).

## IV. Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that the Evans Motion [#32] and the Weld Motion [#44] be **GRANTED in part** and **DENIED in part** as outlined above.

Because the Motion to Stay Discovery Based Upon Qualified and Sovereign Immunity [#45] and the Motion for Stay of Discovery [#51] seek a stay until the Evans Motion and the Weld Motion are addressed by the Court, IT IS HEREBY **ORDERED** that the Motion to Stay Discovery Based Upon Qualified and Sovereign Immunity [#45] and the Motion for Stay of Discovery [#51] are **DENIED as moot**.

IT IS HEREBY **ORDERED** that, pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.   A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.   *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).   A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.   *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  February 29, 2016

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge