**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-00635-CMA-KLM

JOEL RAGUINDIN, and
JENNA FOX,

    Plaintiffs,

v.

MICHAEL YATES, individually,
JASON PHIPPS, individually,
MIKE PARKOS, individually,
PATRICK HAUGSE, individually,
CHIEF OF POLICE RICK BRANDT, in his official capacity,
WELD COUNTY SHERIFF STEVEN REAMS, individually and in his official capacity,
and
PAUL WOOD, individually,

    Defendants.

**ORDER ADOPTING AND AFFIRMING IN PART FEBRUARY 29, 2016
RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This case was referred to United States Magistrate Judge Kristen L. Mix pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 72. (Doc. # 10.) This matter is before the Court on the February 29, 2016 Recommendation issued by Judge Mix regarding two Motions to Dismiss (Doc. ## 32, 44) filed by Defendants in this matter. (Doc. # 74.)

**I. BACKGROUND**

The full factual background of this case was provided in Magistrate Judge Mix's thorough Recommendation, which is incorporated herein by reference; accordingly, this

background will not be reiterated in full here. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). However, the Court will provide some factual background as necessary to analyze Judge Mix's Recommendation and Defendants' Objections thereto.

On January 1, 2012, at her home in Evans, Colorado, Ashley Fallis died of a gunshot wound to the head. Her death was pronounced a suicide by the Weld County Coroners' office on January 6, 2012. (Doc. # 22, ¶¶ 2, 5.) Plaintiffs allege that Defendants, employees of the Evans Police Department and Weld County Sheriff's Department, destroyed, covered up, and falsified evidence indicating that she was murdered by her husband, Tom Fallis, who was a Weld County Corrections Officer. Specifically, they allege that:

> Defendant Paul Wood, acting, on information and belief, at the instruction of Sheriff Reams who was supervising, gave multiple orders at the scene to Weld County deputies, including justice-obstructing orders **not to write reports regarding what they saw, heard or learned** and when to leave the residence.
>
> A neighbor and witness, Nick Glover, was interviewed by Officer Yates and told [Officer Yates] that **he overheard Tom Fallis confess to his parents that he murdered his wife . . . Nick Glover reportedly told Defendant Yates that he distinctly heard him say, "I shot her."** More specifically, during his interview with Officer Yates, shared, on information and belief, with the other individual defendants, Mr. Glover reported that he heard the following incriminating exchange immediately after the shooting between Mr. Fallis and his parents that Officer Yates is believed to have written down:
> • Mr. Fallis: **"Oh my God, I can't believe I did it. Oh my God, what have I done. What have I done."**
> • Mr. Fallis' parents: "What. What are you saying."
> • Mr. Fallis: "I shot her."
> Outrageously, Officer Yates and/or other involved Defendants or Evans police officers **consciously decided to not include this highly incriminating confession witnessed by Mr. Glover or that a confession by Tom Fallis was also heard by other officers in their official reports.**

2

**Officer Yates,** on information and belief, supported and/or supervised by the other individual defendants, additionally **altered/destroyed another witness's original reporting of the shooting, changing her report from a highly incriminating account into a manufactured suicide account.** Mr. Glover's mother, Kathy Glover, reported to Officer Yates that she received a phone call from neighbor Chelsea Arrigo immediately after the shooting. She reported that Ms. Arrigo told her: **"Call police, your neighbor just shot his wife."** (Emphasis supplied). Officer Yates, on information and belief, with the knowledge or support of the other individual defendants, however, deliberately altered and/ or destroyed this phone conversation in his official report, falsely characterizing Ms. Arrigo's original statement to Ms. Glover as: **"[P]lease tell me you called the cops . . . your neighbor just shot herself."** (Emphasis added.)[1]

Upon learning that their accounts had been altered, Nick Glover and Kathy Glover reportedly prepared sworn affidavits describing their original accounts to the police, and have also stated that they were shocked to learn of the omissions and misstatements in the police reports that were prepared. When confronted about his conduct as described by these witnesses, Defendant Yates reportedly did not deny the claims and referred the reporter to Chief Brandt.

Weld County Deputy Sheriff, Chris Graves, was "instructed" by Evans police to watch Tom Fallis at the scene. **While doing so, Deputy Graves heard Tom Fallis confess to killing his wife.** Several law enforcement officers were also then present in a position to hear Tom Fallis so state and confess.

On information and belief, t**he Evans Police Department related Defendants or some of them and/or other Evans police officers also heard and/or were otherwise aware of this confession by Tom Fallis but, as afore alleged, did not include it in any of their reports or arrest and charge Tom Fallis**.

---

[1] Although Judge Mix did not mention the following allegations, the Court finds them worth noting:

"The named individual Defendants chose to ignore a number of other critical incriminating observations that neighbor Arrigo made to investigating officers, including that Ms. Arrigo heard Ms. Fallis being assaulted by Tom Fallis . . . [Arrigo also] told Greeley Police Department Sergeant Turk and Evans Police Department Officer Croissant that she overheard the shooting." (Doc. # 9, ¶¶ 81-83, 85.)

"To the express knowledge of all Defendants, Ashley Fallis' then-six year old daughter, reported about her own father, Tom Fallis: 'I saw my Daddy get the gun ready and shoot mommy 3 times', but this eye-witness statement was completely and utterly disregarded by these Defendants in charge of this investigation." (*Id.*, ¶ 90.)

> **Defendant Commander Wood**, acting, on information and belief, at the instruction of Defendant Sheriff Reams, told multiple deputies responding to the scene, including Chris Graves and Andrea Rusch **directly and/or in response to inquiries, that they were not to write reports concerning this matter.**
>
> Recently to further divert from his own liability, Defendant Reams has falsely stated that the explanation for no reports was not these outrageous command instructions but rather resides "in the power of laziness" by the former deputy.
>
> On information and belief, **Defendant Wood and Defendant Reams,** in taking these and related actions together with the Evans police Defendants, **were consciously aware that Deputy Graves and/or other Weld County and Evans officers had also overhead Tom Fallis confess to murdering Ashley Fallis**.

(Doc. # 74 at 5–6) (citing Doc. # 22, ¶¶ 76, 80–89, 91–97.)

Many of Plaintiffs' allegations are derived from an investigation conducted by Fox 31 Denver Reporter Justin Joseph, who "spent over a year combing through records and finding witnesses to [Ms. Fallis'] death." (Doc. # 22, ¶ 153.) Shortly after Mr. Joseph's news report regarding the investigation aired in April of 2014, the Evans Police Department re-opened the case. (*Id.*, ¶¶ 157.) After a new, independent investigation was conducted by the Fort Collins Police Department, Mr. Fallis was indicted by a grand jury for the murder of Ms. Fallis in November of 2014, and that case is ongoing. (*Id.*, ¶¶ 157, 159.) Additionally, the Weld County Pathologist, Dr. Wilkerson, has since retracted his determination that Ms. Fallis' cause of death was a suicide, reportedly stating in a letter that: "Physical altercation preceded death. Other factors in new investigation do not unequivocally support suicide as a manner of death. Homicide is also a consideration." (*Id.*, ¶ 158.)

Plaintiffs, Joel Raguindin and Jenna Fox, the father and mother of Ashley Fallis, sued Evans Police Department employees[2] ("the Evans Defendants"), and Weld County employees[3] ("the Weld Defendants") who were involved in the investigation of Ms. Fallis' death, alleging (1) denial of due process pursuant to 42 U.S.C. § 1983, alleging that law enforcement's conduct in destroying, covering up, and falsifying evidence blocked Plaintiffs' access to courts,[4] and also, that Evans' Chief of Police failed to train his officers properly; (2) denial of due process pursuant to 42 U.S.C. § 1983, alleging a deprivation of liberty interests arising from the stigma of Ms. Fallis' suicide designation (otherwise known as a "stigma plus" claim); and (3) a state law tort claim of willful and wanton outrageous conduct (otherwise known as intentional infliction of emotional distress). (*Id.*)

Magistrate Judge Mix recommended that the Court grant the Evans Defendants' and the Weld Defendants' Motions to Dismiss with respect to Plaintiffs' so-called "stigma plus" claim,[5] but recommended that the Motions be denied in all other respects. Specifically, she concluded that (1) Plaintiffs sufficiently stated a due process claim

---

[2] Plaintiffs sued Evans Police Officer Michael Yates, Sergeant Jason Phipps, Commander Mike Parkos, and Commander Patrick Haugse in their individual capacities, and Chief of Police Rick Brandt in his official capacity.

[3] Plaintiffs sued Weld County Sheriff Steven Reams in both his individual and official capacities, and Commander Paul Wood in his individual capacity.

[4] Specifically, Plaintiffs brought a "backwards-looking" access to courts claim, which alleges that a plaintiffs' "suit[] ended poorly or [was] ultimately precluded because of a state actor's past misconduct." *See Walker v. Hickenlooper*, No. 14-1462, -- Fed. App'x. --, 2015 WL 5847486, at *6-7 (10th Cir. Oct. 8, 2015).

[5] Plaintiffs did not object to Judge Mix's determination on their "stigma plus" claim. (*See* Doc. # 81.)

pursuant to 42 U.S.C. § 1983 for denial of access to the Courts, and that this claim was not barred by Defendants' qualified immunity as law enforcement officers; and (2) Plaintiffs sufficiently stated an outrageous conduct claim. (Doc. # 74.) Thereafter, Defendants filed a timely Objection to Magistrate Judge Mix's Recommendation (Doc. # 77), and Plaintiffs filed a timely Response (Doc. # 81).

## II. ANALYSIS

### A. Legal Standard

When a magistrate judge issues a recommendation on a dispositive matter, Fed. R. Civ. P. 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." In conducting its review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.*

### B. Application

#### 1. Whether Defendants Were Entitled to Qualified Immunity

Defendants' first objection to Magistrate Judge Mix's determination is their argument that "nothing that Defendants have allegedly done has prevented Plaintiffs from accessing [the] courts," and, as such, that Plaintiffs cannot state a claim for the unconstitutional denial of access to the courts, because such a claim requires "the complaint [to] identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." (Doc. # 77 at 7) (quoting *Christopher v. Hardbury*, 536 U.S. 403, 414 (2002)). However, the Court agrees with Judge Mix's

6

conclusion on this score – that "if the Court determines that even one . . . avenue[] [for court access] has been foreclosed as a result of Defendants' alleged actions, that is sufficient for purposes of the Court's analysis of the Motions" – and also with her determination that "[t]here can be no question that the designation of Ashley Fallis' death as a suicide prevented Plaintiffs from asserting rights under Colo. Rev. Stat. § 15-11-803 (governing the effect of homicide on intestate succession, wills, trusts, joint assets, life insurance, and beneficiary designations) and Colo. Rev. Stat. § 15-21-203 (governing the priority among persons seeking appointment as personal representative)." (Doc. # 74 at 19.)

Defendants' second objection to Judge Mix's qualified immunity determination is somewhat thornier, and it primarily revolves around whether she correctly determined the law was "clearly established" that the deliberate destruction and falsification of evidence by state actors violates an individual's right of court access. By way of background, the doctrine of qualified immunity protects government officials from liability for civil damages if "'their conduct does not violate clearly established . . . constitutional rights of which a reasonable officer would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The test is one of objective reasonableness, in light of the law at the time of the alleged violation. *Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992). In contrast to a motion for summary judgment, which places the burden on the moving party to point out the lack of any genuine issue of material fact for trial, a motion to dismiss based on a claim of qualified immunity imposes the burden on the plaintiff to show "both that a constitutional violation

occurred **and** that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009) (internal quotations omitted, emphasis added). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 511 (10th Cir. 2011) (quoting *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010)). Nevertheless, the overarching inquiry is "whether the law put officials on fair notice that the described conduct was unconstitutional," *Clark v. Wilson*, 625 F.3d 686, 6990 (10th Cir. 2010), and this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Judge Mix began her discussion of Defendants' qualified immunity arguments by examining an unpublished Tenth Circuit decision, *Stump v. Gates*, 986 F.2d 1429 (table decision) (10th Cir. 1993). In that case, the decedent was found dead in his home and his death was reported a suicide. After allegations of impropriety prompted a grand jury investigation, the decedent's children filed a civil lawsuit against the chief of police and a police detective, against whom they made very similar allegations to those involved in the instant case (though, notably, the conduct alleged in *Stump* was not as egregious).[6]

---

[6] In *Stump*, these allegations included the following: (1) the Arapahoe County Coroner was initially barred from entering the decedent's home; (2) no autopsy was ordered or performed; (3) ballistics tests were not ordered or performed; (4) [decedent's wife] was not interviewed by the police until May 28, 1984, eight days after her husband's death; (5) [decedent's] hands were not bagged to preserve evidence for a trace metal detection test (TMDT); (6) the results of the

*See Stump v. Gates*, 777 F. Supp. 808, 813–14 (D. Colo. 1991).  The Tenth Circuit affirmed the District Court's denial of qualified immunity and its determination that the plaintiffs' right of access to the courts under these circumstances was clearly established at the time of the alleged improprieties, explaining:

> In order for a right to have been clearly established, this court requires "some, but not necessarily precise, factual correspondence" between cases predating the alleged violation and the facts of the case in question. *Calhoun v. Gaines*, No. 91-6152, 1992 WL 387385, at *4 (10th Cir. Dec. 30, 1992). "In essence, this standard requires officials to know well developed legal principles and to relate and apply them to analogous factual situations." *Id.*  The parties naturally characterize the qualified immunity issue differently.  We believe, however, that **the appropriate statement of that issue in the context of the allegations of this complaint is whether a reasonable officer would have known at the time of Ocrant's death that a deliberate failure to investigate and quick destruction of evidence that might have proved homicide was a violation of the decedent's children's right of access to the courts.**
> . . .
> We emphasize that all that is before us are the allegations of the complaint, alleging deliberate action and conspiracy, which we must take as true.  **We believe that any reasonable officer would have known that if the conduct occurred as alleged by plaintiffs in this case, it would violate the constitutional rights of the decedent's children.**

*Stump*, 986 F.2d 1429, at *2 (emphasis added).

Judge Mix noted that Defendants argued that *Stump's* holding should be disregarded entirely because it is an unpublished opinion and also because it was not cited in *Lynch v. Barrett*, 703 F.3d 1153, 1162 (10th Cir. 2013), a more recent Tenth Circuit case involving a (somewhat similar) access-to-courts claim.  Defendants make

---

TMDT performed on [decedent] were not compared to the weapon found in his hand; (7) no TMDT or antimony testing was performed on [decedent's wife]; (8) no fingerprint testing for comparison to fingerprints other than [decedent's] was performed; (9) at [decedent's wife's] request, the two guns and other evidence seized from the Ocrant home were destroyed by the Greenwood Village Police Department on June 1, 1984.  777 F. Supp. 808, 813–14 (D. Colo. 1991.)

9

this argument again in their Objection to Judge Mix's Recommendation, and are correct in noting that an unpublished decision cannot be relied upon in determining whether the law was clearly established. *Green v. Post*, 574 F.3d 1294, 1310 n. 10 (10th Cir. 2009).[7] Nevertheless, Judge Mix also hypothesized that the Tenth Circuit's failure to cite *Stump* in *Lynch* was "likely because *Lynch* is distinguishable from both *Stump* and the instant case." (Doc. # 74 at 23.) She then carefully canvassed law from the other circuit courts of appeals on this question, noting that the Fifth, Seventh, and Ninth Circuits recognize a constitutional right of access to the courts based on the bad faith destruction of evidence;[8] that the Eighth Circuit recognizes a denial or access to the courts claim for the materially identical conduct of falsifying evidence;[9] and that the Seventh Circuit, which has the best-developed line of cases, "draws a distinction based on the degree of damage to the plaintiffs' underlying claim rather than the nature of

---

[7] In *Green*, the Tenth Circuit noted that the Fourth Circuit has given a particularly "cogent" explanation as to why unpublished opinions should not be considered in determining whether the law is clearly established:

> Since unpublished opinions are not even regarded as binding precedent in our circuit, such opinions cannot be considered in deciding whether particular conduct violated clearly established law for purpose of adjudging entitlement to qualified immunity. We could not allow liability to be imposed upon public officials based upon unpublished opinions that we ourselves have determined will be binding only upon the parties immediately before the court.

574 F.3d at 1310 n. 10 (quoting *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir.1996)). As explained in greater detail below, these concerns are less of an issue here, in light of the Court's finding regarding the "obvious clarity" with which Defendants' alleged misconduct violated Plaintiffs' constitutional rights.

[8] *Webster v. City of Houston*, 735 F.2d 838, 846 (5th Cir. 1984); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1260–66 (7th Cir. 1984); *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir. 1988).

[9] *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 850–54 (8th Cir. 2013).

defendant's misconduct." (*Id.* at 24.)  Ultimately, she determined that, "*Stump*, **in addition to the various cases from other circuits** as applied to the factual allegations in this case, are enough for the Court to find that Defendants were on notice that their alleged actions would violate Plaintiffs' constitutional rights." (*Id.* at 25) (emphasis added).  Although Defendants characterize the cases on which Judge Mix relied as "distinguishable and unpersuasive," the Court has reviewed each of them, and agrees that, overall, Judge Mix correctly concluded that the general weight of authority in several other circuits is that the law is well-established that the **bad faith destruction and/or falsification of evidence** violates an individual's constitutional right to access the courts.

The soundness of Judge Mix's conclusion, then, is premised on her conclusion that *Lynch*'s facts are "manifestly distinguishable" from the facts of this case.  In *Lynch*, the plaintiff brought a denial of access to the courts claim because the police officers who were dispatched to the location where excessive force was allegedly used on him refused to disclose which police officer was involved in actually exercising that force. 703 F.3d at 1155.  The Tenth Circuit noted

> Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed even the burdens of litigation.  **It is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.**

*Id.* at 1161 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).  It also emphasized that "**All this is not to say that qualified**

11

**immunity shields official action unless controlling precedent squarely holds the challenged action unlawful**; rather 'in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (emphasis added, quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Although the Tenth Circuit ultimately held that "[a]t least in the Tenth Circuit, the question of whether **an evidentiary cover-up by police officials** may violate an individual's constitutional right to court access **was not clearly established** at the time of the alleged violation [in March 2008] . . . . In other words, **whether the scope of the right to access extended as far as Plaintiff claims was 'far from obvious**,'" *id.* at 1162 (emphasis added), Judge Mix argued that Defendants' attempts to apply *Lynch* to the facts of the case at bar effectively painted its holding with "too broad a brush." (Doc. # 74 at 28.) This Court agrees.

As Judge Mix specifically noted, although *Lynch*'s holding was broadly worded (in that it related to "an evidentiary cover-up by police officials"), the misconduct actually alleged by the plaintiff in *Lynch* involved "only a 'conspiracy of silence'; in sum, a refusal to disclose evidence." (*Id.* at 29.) Indeed, the police misconduct in that case, although described by the Tenth Circuit as "inexcusable," was strictly limited to the officers' "refus[al] to identify the perpetrator(s)" who struck the plaintiff with excessive force. *See Lynch v. Barrett,* No. 11-CV-1120-RBJ-MEH, 2012 WL 1890442, at *1 (D. Colo. May 24, 2012); 703 F.3d at 1155, 1163. In contrast, the conduct alleged here is **considerably more egregious in nature** as well as **different in kind** than the mere failure to disclose relevant information. Indeed, Plaintiffs specifically allege that the police officers who investigated Ms. Fallis' death **intentionally fabricated evidence** that effectively allowed

Mr. Fallis to escape prosecution for Ms. Fallis' alleged murder for **two entire years**,[10] including deliberately omitting confessions made by **Mr. Fallis himself** from their own police reports; intentionally falsifying evidence from witnesses to fit their falsely fabricated story that Ms. Fallis committed suicide (including altering witness statements such as that of neighbor Chesea Arrigo, who actually told the officers, "Call the police, your neighbor just shot his wife," but was represented by officers as saying, "Please tell me you called the cops . . . your neighbor just shot herself"); and presenting incomplete evidence to the Weld County Coroner who investigated the cause of Ms. Fallis' death (who, not incidentally, has since withdrawn his original suicide finding). As such, Defendants' attempt to characterize the conduct in this case as a similar "conspiracy of silence" – by noting that Defendants in this case are also alleged to have "covered up evidence and did not disclose a confession" (Doc. # 77 at 4) – is, to put it mildly, unpersuasive. Accordingly, the Court agrees with Judge Mix's determination that *Lynch* is distinguishable and simply does not control the qualified immunity analysis here.

Additionally, it is important to note that In *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008), the Tenth Circuit explained that "[t]he law is clearly established [for qualified immunity purposes] **either if** courts have previously ruled that materially similar conduct was unconstitutional, **or if 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct'** at issue." *Id.* at 1290 (emphasis added, quoting *United States v.*

---

[10] Indeed, Plaintiffs allegations at least indicate that had a reporter not happened to uncover the alleged misconduct by investigating this case for over a year, it is not clear whether Mr. Fallis would have ever been indicted at all.

Mr. Fallis to escape prosecution for Ms. Fallis' alleged murder for **two entire years**,[10] including deliberately omitting confessions made by **Mr. Fallis himself** from their own police reports; intentionally falsifying evidence from witnesses to fit their falsely fabricated story that Ms. Fallis committed suicide (including altering witness statements such as that of neighbor Chesea Arrigo, who actually told the officers, "Call the police, your neighbor just shot his wife," but was represented by officers as saying, "Please tell me you called the cops . . . your neighbor just shot herself"); and presenting incomplete evidence to the Weld County Coroner who investigated the cause of Ms. Fallis' death (who, not incidentally, has since withdrawn his original suicide finding). As such, Defendants' attempt to characterize the conduct in this case as a similar "conspiracy of silence" – by noting that Defendants in this case are also alleged to have "covered up evidence and did not disclose a confession" (Doc. # 77 at 4) – is, to put it mildly, unpersuasive. Accordingly, the Court agrees with Judge Mix's determination that *Lynch* is distinguishable and simply does not control the qualified immunity analysis here.

Additionally, it is important to note that In *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008), the Tenth Circuit explained that "[t]he law is clearly established [for qualified immunity purposes] **either if** courts have previously ruled that materially similar conduct was unconstitutional, **or if 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct'** at issue." *Id.* at 1290 (emphasis added, quoting *United States v.*

---

[10] Indeed, Plaintiffs allegations at least indicate that had a reporter not happened to uncover the alleged misconduct by investigating this case for over a year, it is not clear whether Mr. Fallis would have ever been indicted at all.

*Lanier*, 520 U.S. 259, 271 (1997)).  It is important to note, then, that the Tenth Circuit has explicitly held that the fabrication of inculpatory evidence and the disregarding of exculpatory evidence by a forensic chemist in a police department violated a plaintiff's clearly established constitutional rights, and noted as follows:

> **Even if there were no case directly on point** imposing liability on officials whose falsification of evidence occurred at the post-arrest stage, **an official in Ms. Gilchrist's position could not have labored under any misapprehension that the knowing or reckless falsification and omission of evidence was objectively reasonable.**
>
> Qualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms.  **Ms. Gilchrist's alleged misconduct did not stem from a miscalculation of her constitutional duties, nor was it undertaken in furtherance of legitimate public purposes that went awry.**  Rather, as alleged, Ms. Gilchrist engaged in a deliberate attempt to ensure the prosecution and conviction of an innocent man.  **Such conduct, if it can be proven at trial, violated Mr. Pierce's constitutional rights with "obvious clarity."**

*Pierce v. Gilchrist*, 359 F.3d 1279, 1299-300 (10th Cir. 2004) (emphasis added). Similarly, here, according to Plaintiffs' allegations, Defendants could not have possibly labored under "any misapprehension" that falsifying police reports and intentionally destroying evidence to prevent an individual from being arrested for a murder to which he allegedly confessed "was objectively reasonable."  Likewise, the alleged misconduct of the Defendants also did not "stem from a miscalculation of [their] constitutional duties, nor was it undertaken in furtherance of legitimate public purposes that went awry." Although the circumstances here are slightly different from those presented in *Pierce*, insofar as Defendants' misconduct allowed an allegedly guilty man to go free, rather than led to the incarceration an innocent man, the Court does not believe that the Tenth

Circuit would attach any weight to this distinction, particularly in light of the egregiousness of Defendants' alleged conduct. *See id.* at 1298 (noting that the Tenth Circuit uses a "sliding scale" system in which "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.")

In sum, Magistrate Judge Mix did not err when she concluded that Defendants' actions were devoid of objective reasonableness, and their alleged conduct violated Plaintiffs' clearly established Constitutional rights to court access.

2. **Whether Plaintiffs' State Tort Claim Must Be Dismissed for Failure to Provide Timely Written Notice Pursuant to the Colorado Governmental Immunity Act**

The Colorado Governmental Immunity Act (CGIA) required Plaintiffs to serve Defendants with notice of their tort claims within 182 days of the date of "discovery" of their injury. Colo. Rev. Stat. § 24-10-109(1). Magistrate Judge Mix acknowledged that the question of the date of "discovery in the instant case is complicated," but determined that Plaintiffs had provided timely written notice, concluding that the earliest possible point in time when Plaintiffs could have discovered their injury (i.e., the emotional distress resulting from the Defendants' alleged destruction, concealment and fabrication of evidence that their daughter's death was the result of a murder rather than a suicide), was April 8, 2014, the date of the investigatory report into Defendants' alleged wrongdoing. (Doc. # 81 at 13.) She explained that "clearly Plaintiffs could not have known the basis for their willful and wanton outrageous conduct claim prior to the subsequent investigation because, while they were upset about their daughter's death,

they did not know of the alleged actions of Defendants." (*Id.*) Defendants counter both that that Plaintiffs had notice of their claims as of 2012, "when Ashley Fallis' death was designated a suicide," and also that Magistrate Judge Mix erred in failing to hold a so-called "Trinity" evidentiary hearing on the matter of notice, so named for *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 928 (Colo. 1993). (*Id.* at 10.)

It is clear that Judge Mix based her finding of timely notice on the allegations in Plaintiffs' Complaint in stating that, "According to Plaintiffs' allegations, Mr. Joseph's first report relating to his investigation of Ashley Fallis' death aired in April 2014." (Doc. # 74 at 32.) Accordingly, Defendant's argument that she did not base this determination on "admissible factual evidence [indicating] when Plaintiffs' injury was discovered, such as affidavits or declarations, because Plaintiffs did not submit any such evidentiary support," is well taken. (Doc. # 77 at 10.) It is also clear that, under Colorado law, "[i]f the facts relating to immunity are in dispute, the court **must** hold an evidentiary hearing." *Masters v. Castrodale*, 121 P.3d 362, 364 (Colo. App. 2005) (emphasis added, citing *Corsentino v. Cordova*, 4 P.3d 1082 (Colo. 2000)); *see also Gallagher v. Bd. of Trustees for Univ. of N. Colo.*, 54 P.3d 386, 391 (Colo. 2002) (emphasis added) ("When there is a factual dispute concerning when the plaintiff discovered her injury, an evidentiary hearing **is necessary** to resolve the dispute.") Based on the facts of this case, the Court does not anticipate Plaintiffs will have difficulty in showing that they provided timely notice under the CGIA. However, given this dispute, and the fact that Plaintiffs could have conceivably had adequate suspicions of Defendants' alleged wrongdoing prior to April 2014, it seems that an evidentiary hearing is, in fact, required.

As such, the Court will not adopt this aspect of Judge Mix's Recommendation. Instead, the Court reserves ruling on this issue and will order an evidentiary hearing to be conducted regarding the timeliness of Plaintiffs' notice under the CGIA.

### III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the February 29, 2016 Recommendation of United States Magistrate Judge Kristen L. Mix (Doc. # 74) is AFFIRMED and ADOPTED IN PART as an order of this Court. Specifically, the Court ADOPTS Magistrate Judge Mix's conclusion that Plaintiffs' claims are not barred by virtue of qualified immunity, as well as her recommendation that Plaintiffs' "stigma plus" claim be dismissed, but NEITHER AFFIRMS NOR REJECTS her recommendation regarding the timeliness of Plaintiffs' notice under the CGIA. Pursuant to the Recommendation, it is

FURTHER ORDERED that Defendants' Motions to Dismiss (Doc. ## 32, 44) are GRANTED in part (with respect to Plaintiffs' "stigma plus" claim), DENIED without prejudice (with respect to the timeliness of Plaintiffs' notice under the CGIA), and DENIED as to the remainder. It is

FURTHER ORDERED that the parties are to contact Judge Mix's chambers to arrange for a hearing regarding the timeliness of Plaintiffs' notice under the CGIA. Finally, it is

FURTHER ORDERED that Defendants' Motion to Join in Objection to the Magistrate Judge's Order and Recommendation Granting in Part and Denying in Part

Defendants' Motions to Dismiss (Doc. # 78) is hereby GRANTED.

Dated: March 31, 2016                                    BY THE COURT:

                                                                                  _____
                                                                                  CHRISTINE M. ARGUELLO
                                                                                  United States District Judge